IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **HEATCRAFT REFRIGERATION** | § | |
| **PRODUCTS LLC,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. **3:20-CV-1689-L** |
| | § | |
| **FREEZING EQUIPMENT** | § | |
| **COMPANY, LLC,** | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Before the court is Defendant Freezing Equipment Company, LLC's Motion for Partial Summary Judgment ("Defendant's Motion") (Doc. 62); and Plaintiff Heatcraft Refrigeration Products, LLC's Motion for Summary Judgment ("Plaintiff's Motion") (Doc. 64), both of which were filed June 18, 2021. After considering the motions, briefs, evidence, evidentiary objections, the record, and applicable law, the court **denies** Defendant's Motion (Doc. 62) and **grants** Plaintiff's Motion (Doc. 64).

### I.     Factual and Procedural Background

Heatcraft Refrigeration Products, LLC ("Plaintiff" or "Heatcraft") is a member of the Lennox International Inc. ("Lennox") family of companies and a long-standing leader in the commercial refrigeration industry that provides refrigeration systems to its customers across the country through various sales representatives like Freezing Equipment Company, LLC ("Defendant" or "FEC") that are paid commissions for their sales of Heatcraft's products.[1]  On

---

[1] Unless otherwise indicated, the facts set forth in this memorandum opinion and order are undisputed.

June 24, 2020, Heatcraft brought this action against FEC, seeking damages and injunctive relief[2] for FEC's alleged breach of the parties' Sales Representative Agreement ("Agreement") that includes, among other things, the parties' understanding regarding Heatcraft's duty to pay commissions earned by FEC as a sales representative and FEC's responsibilities pertaining to confidentiality and noncompetition. Heatcraft contends that FEC breached the Agreement by prematurely terminating and abandoning it.  In addition, Heatcraft contends that, as a result of FEC abandoning the Agreement, it also breached the Agreement by failing to promote and sell Heatcraft products during the remainder of the contract term while selling and soliciting orders for similar products manufactured by Heatcraft's competitor(s).

The bases for these claims, as set forth in Heatcraft's Amended Complaint (Doc. 10), is that FEC breached paragraphs 4.1 and 2.1(a) and (d) of the parties' Agreement.  Paragraph 4.1 deals with the "Term and Termination" of the Agreement, whereas paragraph 2.1 sets forth FEC's responsibilities under the Agreement as a sales representative. Heatcraft contends that FEC breached paragraph 4.1 by prematurely abandoning the Agreement in June 2020 in violation of paragraph 4.1, which, according to Heatcraft, does not permit FEC to terminate the Agreement or stop performing its contractual obligations before December 31, 2020 (the end of the contract term), under any circumstances. Heatcraft, therefore, maintains that FEC was obligated to continue its performance under the Agreement until December 31, 2020, notwithstanding FEC's contention that its performance was excused as a result of Heatcraft's allegedly anticipatory and prior material breach in not paying certain commissions beginning in June 2020 and paying less than what was allegedly owed for other commissions beginning in April and May of 2020.

---

[2] Heatcraft's July 3, 2020 motion for injunctive relief in the form of a preliminary injunction was denied by the court on August 3, 2020.

Heatcraft does not dispute that it did not pay certain commissions and paid less for other commissions under a new reduced commission schedule as of April 1, 2020. It, instead, contends that its payment or nonpayment of commissions comported with the Agreement. Alternatively, it asserts that any such alleged breach by it was not material and, consequently, did not excuse FEC's performance under the Agreement. Heatcraft further asserts that FEC's prior material breach argument is irrelevant because paragraph 4.1 of the Agreement allows only Heatcraft to terminate without cause upon notice or without notice upon FEC's breach. Heatcraft contends that paragraph 4.1, on the other hand, gives FEC no right to terminate the Agreement during the twelve-month contract term; its only option under this paragraph is to give written notice at least 30 days before the January 1 anniversary date that it does not wish to renew the Agreement. Heatcraft, therefore, contends that FEC's decision to terminate and abandon the Agreement on June 2, 2020, six months before the end of the contractual period in contravention of paragraph 4.1, constitutes a material breach of the Agreement.

In addition, Heatcraft contends that, because FEC was not contractually entitled under paragraph 4.1 to terminate the Agreement or discontinue its performance before the end of the contractual term (December 31, 2020), it also breached paragraph 2.1(a) and (d) by failing to continue to: (1) diligently promote sales and solicit orders for Heatcraft's products to Heatcraft customers assigned to FEC and listed in Exhibit A to the Agreement; (2) devote its time and best efforts to the performance of its obligations; and (3) not to sell or solicit orders for like products of manufacturers other than Heatcraft while the Agreement was in effect until the end of December 2020.

In support, Heatcraft contends that, on the same day it received FEC's June 2, 2020 termination letter, it learned from its customers that FEC was soliciting refrigeration products on

behalf of one of Heatcraft's direct competitors (HTPG) and, a short time later, it received evidence of FEC's betrayal in the form of a June 4, 2020 e-mail in which FEC invited a Heatcraft customer—one of FEC's accounts under its Agreement with Heatcraft—to request a competitive bid for refrigeration products from HTPG.[3] Heatcraft further contends that it satisfied all conditions precedent necessary to enforce the Agreement and FEC's performance under the Agreement, or it was excused from doing so as a result of FEC's prior material breaches in discontinuing its its performance under the Agreement.  With respect to its contract claim, Heatcraft requests that "FEC be ordered to pay all actual and consequential damages resulting from its wrongful conduct, including but not limited to lost profits and goodwill, and to disgorge all profits obtained" in violation of the Agreement. Pl.'s Am. Compl. ¶ 53.

On July 31, 2020, FEC filed is Amended Answer, which includes various affirmative defenses and counterclaims (Doc. 21).  These affirmative defenses include those based on FEC's contention that: (1) its performance under the contract was excused by Heatcraft's prior material breach in retroactively reducing commission percentages and underpaying certain commissions under the new reduced commissions schedule and failing to pay other commissions owed; (2) its performance was excused by Heatcraft's fraud or fraudulent inducement in telling FEC that the Agreement had a meaning that it knew or should have known that it did not have; (3) Heatcraft is estopped from taking the positions that (a) it is willing to pay commissions given its prior refusal to pay FEC such commissions in accordance with the Agreement, and (b) FEC must continue to perform its obligations until the end of the contract term even though Heatcraft has not paid FEC since June 2020; (4) Heatcraft failed to mitigate its damages; (5) its performance under the Agreement is "excused because performance became impossible or impractical, including because

---

[3] FEC disputes whether the letter or e-mail establish that it terminated or breached the Agreement as Heatcraft purports.

of supervening circumstances that could not have been anticipated when the contract was executed, *e.g.* Covid," and Heatcraft's decision between March 2020 and April 2020 to significantly reduce commissions and implement the reduced commission schedule retroactively[4]; (6) "Defendant will not be liable to Plaintiff (or not be liable for future specific performance or the full amount of damages Plaintiff is claiming), if and when it provides notice of termination of the parties' Agreement pursuant to section 4.2"[5]; (7) enforcement of the Agreement against FEC would be unconscionable because Heatcraft still owes it money in the form of commissions; (8) FEC is entitled to an offset for amounts owed by Heatcraft; (9) Heatcraft has unclean hands; and (10) Heatcraft caused or contributed to its damages as a result of its business practices.

For counterclaims, FEC asserts a cause of action against Heatcraft for breach of the Agreement in: (1) retroactively reducing commissions and paying FEC for previously earned commissions under the new reduced commissions schedule; and (2) withholding payment entirely beginning in June 2020 for commissions previously earned. Alternatively, FEC sues based on theories of quantum meruit and unjust enrichment.  It also asserts a counterclaim for alleged violation of the Texas Sales Representative Act ("TSRA"), Tex. Bus. & Comm. Code Ann. §§ 54.001-.006.  Both of these claims relate to FEC's contention that Heatcraft failed to pay it commissions owed under the Agreement.  In addition, FEC seeks attorney's fees and costs pursuant to section 54.004 of the Texas Business and Commerce Code and section 38.001 of the Texas Civil Practice & Remedies Code.

In its August 21, 2020 Answer to FEC's affirmative defenses and counterclaims, Heatcraft denies that it wrongfully withheld payment in part or in full for commissions earned by FEC. In

---

[4] Def.'s Am. Ans. ¶ 67.

[5] *Id*. ¶¶ 67, 76-78.

**Memorandum Opinion and Order – Page 5**

this regard, Heatcraft contends that section 3.1 of the Agreement gave it the discretion to change commissions at any time, and the Agreement also allowed it to stop payment for services previously rendered after FEC provided notice of its intent to discontinue its performance and terminate the parties' contract.  Heatcraft also disputes that commissions were underpaid.  It admits that the Agreement states: "The Commissions apply to the price in effect at the time of sale."  Pl.'s Ans. ¶ 79.  It disagrees, though, with FEC's assertion that "time of sale" means "when the customer placed the order with FEC and FEC gave the order to Heatcraft and Heatcraft accepted it." *Id.* ¶ 97.  Heatcraft contends that "time of sale" refers to when products are shipped.  It also disagrees that the TSRA applies to the parties' claims in this case or that FEC is entitled to recover on theories of quantum meruit or unjust enrichment.

On June 18, 2021, the parties filed their cross-motions for summary judgment or partial summary judgment.  Heatcraft moved for partial summary judgment as to FEC's TSRA claim and FEC's request to recover lost profits in connection with its breach of contract claim.  Heatcraft argues that the TSRA is inapplicable, and FEC's pleadings do not include a request to recover damages in the form of lost profits.

Instead of identifying claims or defenses or elements of claims or defenses in accordance with Federal Rule of Civil Procedure 56 on which it contends that it is entitled to summary judgment, FEC moves for summary judgment on the following grounds: (1) "NO FACT ISSUE EXISTS THAT THE AGREEMENT ALLOWS RETROACTIVE COMMISSION CHANGES, BECAUSE IT DOES NOT"; (2) "NO FACT ISSUE EXISTS THAT 'TIME OF SALE' IN THE AGREEMENT SHOULD BE INTERPRETTED AS WHEN THE CUSTOMER AND HEATCRAFT AGREE TO A SALE: (3) "NO FACT ISSUE EXISTS THAT 'TIME OF SALE' IN THE AGREEMENT SHOULD NOT BE INTERPRETTED AS TIME OF SHIPPING

AND/OR TIME OF INVOICING"; (4) "NO FACT ISSUE EXISTS THAT HEATCRAFT'S (1) "LOCKING FEC OUT OF ITS SYSTEMS AND (2) DECIDING THAT FEC WAS A 'COMPETITOR AND SHOULD BE TREATED AS SUCH' WERE MATERIAL BREACHES OF THE AGREEMENT (SINGULAR OR COMBINED)"; (5) "NO FACT ISSUE EXISTS THAT HEATCRAFT SHOULD BE ESTOPPED FROM CLAIMING FEC SHOULD HAVE PERFORMED UNDER THE AGREEMENT BECAUSE HEATCRAFT LOCKED FEC OUT AND DECIDED FEC WAS TO BE TREATED LIKE A COMPETITOR"; (6) "NO FACT ISSUE EXISTS IN SUPPORT OF HEATCRAFT'S 1ST BREACH ALLEGATION"; (7) "NO FACT ISSUE EXISTS IN SUPPORT OF HEATCRAFT'S 2ND BREACH ALLEGATION"; (8) "NO FACT ISSUE IN SUPPORT OF HEATCRAFT'S 3RD BREACH ALLEGATION"; (9) "NO FACT ISSUE EXISTS REGARDING FEC'S DAMAGES IN THE AMOUNT OF $158,891.28"; (10) "NO FACT ISSUE EXISTS THAT FEC HAS NOT DISCLOSED ANY OF HEATCRAFT'S CONFIDENTIAL INFORMATION"; and (11) "NO FACT ISSUE EXISTS THAT FEC NEVER TERMINATED THE AGREEMENT." Def.'s Summ. J. Mot. 1-5 (Doc. 62). Because of the highly unorthodox manner in which FEC's summary judgment grounds are presented, it is extremely difficult for the court to ascertain whether FEC is moving for summary judgment on its own claims and defenses or Heatcraft's claims and, consequently, whether it or Heatcraft has the summary judgment burden for the grounds raised.

For the reasons that follow, the parties' summary judgment motions only slightly narrow the issues remaining for trial. Genuine disputes of material fact exist regarding the parties' breach of contract claims and the meaning of "time of sale" as used in their Agreement that preclude summary judgment as to these claims and related defenses. The court also determines that FEC's

unpleaded fact pattern based on a new "locked out" theory is not a permissible basis for seeking summary judgment or defending against Plaintiff's request for summary judgment.

## II.    Standard for Summary Judgment Motions

Summary judgment shall be granted when the record shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).  A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When ruling on a motion for summary judgment, the court is required to view all facts and inferences in the light most favorable to the nonmoving party and resolve all disputed facts in favor of the nonmoving party.  *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005).  Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254-55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine dispute of material fact.  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986).  On the other hand, "if the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in [its] favor."  *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis in original).  "[When] the record taken as a whole could

not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Matsushita*, 475 U.S. at 587. (citation omitted). Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *See Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994).

The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim. *Ragas*, 136 F.3d at 458. Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.*; *see also Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir. 1992). "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Disputed fact issues that are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id*. If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322-23.

## III.  Discussion

### A.  Plaintiff's Summary Judgment Motion on Defendant's Counterclaims

Heatcraft moves for partial summary judgment on FEC's counterclaims for: (1) breach of contract, specifically with respect to the element of damages and FEC's contention that it is entitled to recover lost profit damages; and (2) alleged violations of the TSRA, specifically with respect to

the applicability of the TSRA to the parties' contract and FEC's entitlement to recover treble damages under the TSRA, which it contends are barred by the Agreement.

### 1. FEC Counterclaim for Breach of Contract (Damages for Lost Profits)

Heatcraft contends that it is entitled to partial summary judgment on FEC's breach of contract counterclaim to the extent FEC seeks damages for lost profits in connection with this claim. Heatcraft asserts that FEC's Supplemented Disclosures and Designation of Experts indicate that FEC is seeking to recover damages for lost profits, even though no request for damages of this kind is included in its pleadings. Pl.'s Summ. J. Br. 9 (citing Pl.'s App. 250-52, FEC's Supp. to Initial Disclosures; FEC's Expert Disclosures 1-4 (Doc. 42)).  Heatcraft contends that any claim for lost profits fails because Texas's causal connection and foreseeability prerequisites for recovering consequential damages are not satisfied, and such damages are precluded by section 5.1 of the Agreement.

FEC disagrees and argues that lost profits are not precluded by the Agreement or Texas law. In this regard, FEC contends that Heatcraft, as the party that materially breached the Agreement, cannot enforce the remaining terms of the contract, and FEC may "treat the contract as ended and cease performance."  Def.'s Resp. 3 (citations omitted).  In a footnote, without specifically addressing Heatcraft's contention that FEC's pleadings do not include a claim for lost profits, FEC also asserts, on information and belief, that Heatcraft was aware of the factual basis for its position that it suffered lost profits as a result of Heatcraft's material breach in "lock[ing] FEC out of [Heatcraft's] systems, so that [FEC] could not perform its duties under the Agreement." Def.'s Summ. J. Resp. Br. 2 & n.3.

The measure of damages generally recoverable in a breach of contract action under Texas law is "actual damages." *Mead v. Johnson Grp., Inc*., 615 S.W.2d 685, 687 (Tex. 1981). Actual

damages are either "direct or consequential." *Arthur Andersen & Co. v. Perry Equip. Corp*., 945 S.W.2d 812, 816 (Tex. 1997) (internal quotation marks and citations omitted). Direct damages are those that "are the necessary and usual result of the defendant's [breach]," such that "they flow naturally and necessarily from the wrong." *El Paso Mktg., L.P. v. Wolf Hollow I, L.P*., 383 S.W.3d 138, 144 (Tex. 2012) (quoting *Arthur Andersen*, 945 S.W.2d at 816) (internal quotation marks omitted). Consequential damages, also referred to as "special damages," are damages that "result naturally but not necessarily from the wrongful act because they require the existence of some other fact beyond the relationship of the parties." *DaimlerChrysler Motors Co., LLC v. Manuel*, 362 S.W.3d 160, 180 (Tex. App.—Fort Worth 2012, no pet.) (citing *Arthur Andersen*, 945 S.W.2d at 816). "Lost profits may be in the form of direct damages, that is, profits lost on the contract itself, or in the form of consequential damages, such as profits lost on other contracts or relationships resulting from the breach." *Mood v. Kronos Products, Inc*., 245 S.W.3d 8, 12 (Tex. App.—Dallas 2007, pet. denied) (citation omitted).

In this case, section 5.1 of the Agreement expressly precludes recovery of consequential damages and special damages:

> 5.1 IN NO EVENT WILL THE COMPANY BE LIABLE TO SALES REPRESENTATIVE FOR INDIRECT, INCIDENTAL, CONSEQUENTIAL, PUNITIVE, OR SPECIAL DAMAGES, INCLUDING BUT NOT LIMITED TO THE LOSS OF PROSPECTIVE PROFITS OR ANTICIPATED SALES OR ON ACCOUNT OF EXPENDITURES, INVESTMENTS, LEASES, PROPERTY IMPROVEMENTS OR COMMITMENTS IN CONNECTION THEREWITH, WHETHER OR NOT FORESEEABLE.

Pl.'s App. 189. Contrary to FEC's assertion, Heatcraft's alleged material breach of the Agreement as a result of its failure to pay certain commissions allegedly owed under the otherwise enforceable contract does not automatically render section 5.1 unenforceable. *See Sheline v. Dun & Bradstreet Corp*., 948 F.2d 174, 177-78 (5th Cir. 1991) (citing *Hanks v. GAB Business Servs., Inc*., 644

S.W.2d 707, 708 (Tex. 1982)).   Moreover, limitation-of-liability clauses like section 5.1 "are generally valid and enforceable" under Texas law. *Bombardier Aerospace Corp. v. SPEP Aircraft Holdings*, LLC, 572 S.W.3d 213, 231 (Tex. 2019) (citation omitted).   In addition, section 4.4 of the Agreement expressly provides that "[a]ll Sections of this Agreement will survive expiration or termination of the Agreement as necessary for the Parties to fulfill their obligations under the Agreement." Pl.'s App. 189.

Defendant's disclosures reference two sources of contractual damages: (1) approximately $189,000 in damages for commissions owed before June 2020; and (2) additional consequential damages totaling approximately $700,000 for "lost profits" between June 2020 and December 2020 that FEC contends it would have earned if it had not been locked out of Heatcraft's system and had been allowed to continuing performing under the contract until the end of December 2020.[6] The court need not determine whether Defendant's lost profit damages qualify as direct or consequential because, as correctly noted by Plaintiff, these damages for lost profits and FEC's "locked out" theory of recovery are not supported by the factual allegations in FEC's amended pleadings. In addition, FEC has never sought to amend to add breach of contract claim or affirmative defense on the theory that Heatcraft materially breached the Agreement by locking FEC out of its system in June 2020, making it impossible for it to perform the remainder of the contractual period.

It is well-established that a claim raised for the first time in the context of a summary judgment motion is "not properly before the court." *Cutrera v. Board of Supervisors of La. State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005) (quoting *Fisher v. Metropolitan Life Ins. Co.*, 895 F.2d

---

[6] Def.'s Expert Disclosures 3 (Doc. 43); Pl.'s App. 250-51.

**Memorandum Opinion and Order – Page 12**

1073, 1078 (5th Cir. 1990)).  At the motion to dismiss stage, "the fact that a plaintiff pleads an improper legal theory does not preclude recovery under the proper theory" or amendment of pleadings. *Doss v. South Cent. Bell Tel. Co.*, 834 F.2d 421 (5th Cir. 1987). This case, however, was previously set for trial and was far beyond the motion to dismiss stage when the court first learned in reviewing the parties' summary judgment submissions that FEC was asserting a new breach of contract claim and seeking damages for lost profits for the period between June 2020 and December 2020 on an entirely new factual basis.

The Fifth Circuit has admonished litigants for engaging in a "wait and see" approach particularly when a litigant is represented by counsel and fails to assert a claim as soon as it could have. *Goldstein v. MCI WorldCom*, 340 F.3d 238, 255 n.6 (5th Cir. 2003) (citation omitted). The Fifth Circuit has also made clear that a "busy district court need not allow itself to be imposed upon by the presentation of theories seriatim." *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 864-65 (5th Cir. 2003) (citation omitted); *Southern Constructors Grp., Inc. v. Dynalectric Co.*, 2 F.3d 606, 612 (5th Cir. 1993) (noting that the Fifth Circuit has affirmed denials of requests for leave to amend when the movant "attempted to present theories of recovery seriatim to the district court") (citation omitted).  As the Fifth Circuit explained in *Southern Constructors*, allowing a party to proceed on a new unpleaded theory of recovery late in the case would amount to proceeding in a "blind-hog-occasionally-finds-an-acorn approach" that would wreak havoc with pretrial procedure and undermine or "negate the . . . winnowing process that occurs under the present federal rules" for narrowing the facts and relevant legal issues for trial.  *Southern Constructors Grp., Inc.*, 2 F.3d at 610 (footnote omitted).

To date, FEC has not expressly sought to amend its pleadings to add a new contract claim and request for lost profit damages based on its "locked out" theory.  FEC filed a motion for leave

to amend its pleadings on March 4, 2021 (Doc. 41), but it did not seek leave to amend for purposes of pleading this new factual basis for its breach of contract counterclaim or its new request to recover lost profits as damages based on a "locked out" theory. Even if the court construed FEC's summary judgment response as an implied request to amend it pleadings to add a claim for breach of contract based on this new factual basis, any such request at this late stage would be denied. When FEC filed its response to Heatcraft's summary judgment motion on July 16, 2021, the December 15, 2020 deadline for pleadings amendments had long since expired.

As indicated, FEC asserts, on information and belief, that Heatcraft was aware, even before filing this action, that FEC was taking the position that Heatcraft material breached the Agreement when it locked FEC out of its system in June 2020. FEC contends that, at the latest, Heatcraft knew for certainty that it was pursuing a contract claim based on this fact pattern by March 23, 2021, as a result of the allegations in its response to Heatcraft's Motion to Compel (Doc. 44) before discovery closed on June 4, 2021.

The court disagrees that this response was sufficient to notify Heatcraft that FEC was pursuing a breach of contract claim and lost profits based on a new yet-to-be pleaded legal and factual theory. FEC's expert disclosures on March 22, 2021, make its intent in this regard slightly more clear. The problem with this argument, however, is that it highlights FEC's own unexplained failure and delay to seek leave to amend its pleadings to add a breach of contract claim and request for lost profits based on its "locked out" theory. Moreover, if FEC was aware, even before Heatcraft filed suit, that it had a potential claim for breach of contract based on this theory, it should have and could have alleged facts supporting such a claim and lost profit damages when it filed its Original Answer & Counterclaim (Doc. 21) on July 31, 2020.

The court also disagrees with FEC's implied suggestion that the notice to Heatcraft before the close of discovery cures its failure to plead facts to support this claim or its delay and outright failure in seeking to amend its pleadings on this ground.  By March 22, 2021, this case had been pending almost one year, but there was only a little more than sixty days remaining before the deadline to complete discovery by this point.  Notwithstanding FEC's suggestion to the contrary, the court does not believe that this would have given Heatcraft, while the parties were in the middle of a discovery dispute, sufficient time to prepare and serve written discovery on FEC and receive a response before June 4, 2021, because the court's scheduling order requires the parties to *complete* all discovery, including expert discovery by this deadline, and explains that "[c]ompletion of discovery means that the discovery must be sent or done so that the answers or responses are produced on or before the deadline date herein set forth."  Scheduling Order ¶ 7 (Doc. 29).  Further, although the parties agreed to extend their respective deadlines to designate experts, this extension would not have given Plaintiff adequate time to conduct discovery before the deadline for preparing and disclosing rebuttal experts and opinions by April 22, 2021, to address the matters in FEC's expert disclosures.[7]

Given the timing of the implied motion to amend by FEC late in the case, long after expiration of the deadlines for completing discovery and amendment of pleadings, and after Heatcraft moved for summary judgment, the court determines that FEC's delay is "particularly egregious," and FEC has not shown that the delay was "due to oversight, inadvertence or excusable neglect."  *Little v. Liquid Air Corp.*, 952 F.2d 841, 846 (5th Cir. 1992).  FEC has also not satisfied or attempted to satisfy its burden of demonstrating good cause under Federal Rule of Civil

---

[7] Paragraph 6(c) of the scheduling order requires rebuttal expert disclosures to be made within 30 days after the opposing party's disclosures, and, as noted, FEC's expert disclosures were made on March 22, 2021 (Doc. 43).

Procedure 16(b).[8] Allowing FEC to amend at this juncture, after briefing on the parties' summary judgment motions is complete and judicial resources have been used to rule on the motions, would significantly diminish the utility of summary judgment procedure. *Id.* at 846 & n.2 (citations omitted).

Additionally, as Heatcraft correctly notes, FEC's new "locked out" theory directly conflicts with its pleaded breach of contract claim and defense that its performance was excused. Regarding its new claim, FEC asserts that it was locked out of Heatcraft's system in early June 2020 and, in doing so, Heatcraft materially breached the Agreement and made it impossible for FEC to perform its obligations as a Heatcraft service representative under the Agreement. FEC further asserts that, at this juncture, it had every intention of continuing to perform under the Agreement and had not decided whether it was going to discontinue its performance. The factual basis for this "locked out" theory, however, contradicts and directly conflicts with the allegations in paragraph 82 of FEC's amended pleadings. In this paragraph, FEC asserts that, after Heatcraft breached the Agreement by applying the new reduced commission schedule to calculate and underpay its commissions for April and May 2020 and refused to remedy this alleged breach, its performance was excused and it made unequivocally clear to Heatcraft that it was terminating the Agreement:

> 82. When FEC received its April 2020 commissions in the beginning of May 2020, FEC noticed that Heatcraft had underpaid commissions. FEC emailed Heatcraft about its contractual underpayment and Heatcraft basically told FEC that it did not

---

[8] Before the court can modify a scheduling order and grant leave to amend a pleading under Rule 15(a) of the Federal Rules of Civil Procedure, the movant must first show "good cause" for failure to meet the scheduling order deadline under Rule 16(b). *S & W Enters., L.L.C. v. Southwest Bank of Alabama*, 315 F.3d 533, 536 (5th Cir. 2003) ("Rule 16(b) governs amendment of pleadings after a scheduling order deadline has expired."). A scheduling order "may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). The good cause standard requires the "party seeking relief to show that the deadlines [could not] reasonably [have been] met despite the diligence of the party needing the extension." *S & W Enters.*, 315 F.3d at 535 (citation omitted). "Only upon the movant's demonstration of good cause to modify the scheduling order will the more liberal standard of Rule 15(a) apply to the district court's decision to grant or deny leave." *Id.* at 536. In deciding whether to allow an untimely amendment, a court considers "(1) the explanation for the failure to timely move for leave to amend; (2) the importance of the amendment; (3) potential prejudice in allowing the amendment; and (4) the availability of a continuance to cure such prejudice." *Id.* at 536 (internal quotation marks, brackets, and citations omitted).

**Memorandum Opinion and Order – Page 16**

owe FEC anything more, no additional payments would be forthcoming, Heatcraft's interpretation of the contract was correct, and FEC's interpretation was just wrong. When FEC found out that Heatcraft was also underpaying FEC's May 2020 commissions, FEC predictably and properly considered Heatcraft in material breach of contract and wrote it letters stating as much and refusing future performance. Once Heatcraft received the first letter, both Sergio Castillejos and Gary Bedard of Heatcraft asked if they could meet with Rick Cleveland, FEC's president. The three men talked, but Heatcraft never offered to remedy their breach, in any way! FEC told Heatcraft that throwing out a line that produces $2 million in revenue took some very serious thought but FEC's mind was made up, based on Heatcraft's material breach, FEC did not trust Heatcraft anymore, and who would! FEC told Heatcraft that because of their material breach and refusal to fix it and adamant position that Heatcraft was not going to pay under the terms of the contract, FEC had no trust or faith in Heatcraft and FEC had to move on and do what was best for the company.

Def.'s Am. Ans. ¶ 82.

While pleading alternative legal theories is permissible under Federal Rule of Civil Procedure 8(a), particularly when the pleader has legitimate doubts about the factual background or legal theories supporting the claims or defenses early on in a case, pleading conflicting facts is not appropriate, especially during the late states of litigation. *Wilson v. Deutsche Bank Tr. Co. Americas as Tr. for Residential Accredit Loans, Inc.*, No. 3:18-CV-0854-D, 2019 WL 175078, at *7 & n.14 (N.D. Tex. Jan. 10, 2019) (citations omitted). The conflicting facts at issue are also facts that have always been within FEC's knowledge.

Accordingly, the court **denies** the implied request by FEC to amend its pleadings on this ground and will not allow FEC to proceed on a breach of contract claim based on its "locked out" theory. Heatcraft is, therefore, entitled to judgment, as a matter of law, on FEC's request to recover damages for lost profits based on this theory, and Plaintiff's Motion as to this claim and FEC's corresponding request for damages for lost profits is **granted**. So that there is no confusion, the court **strikes** FEC's breach of contract claim and request for lost profits based on its new "locked out" theory.

### 2.      FEC Counterclaim for Alleged TSRA Violations

Heatcraft contends that it is entitled to summary judgment on FEC's counterclaim and request for treble damages under the TSRA because such damages are precluded under section 5.1 of the Agreement.  Alternatively, Heatcraft argues that FEC's claim for alleged TSRA violations fails as a matter of law because the TSRA only governs contracts for solicitation of wholesale orders *within the State of Texas* and, thus, does not apply to the parties' contract.

FEC responds, as it did before, that Heatcraft's alleged material breaches of the Agreement rendered the limitation-of-liability provision in section 5.1 unenforceable.  This argument fails for the same reason explained by the court with respect to FEC's request for damages in the form of lost profit damages.  *See Sheline*, 948 F.2d at 177-78 (citing *Hanks*, 644 S.W.2d at 708).

Alternatively, FEC argues that the parties' contract does not specifically exclude TSRA damages, and any construction that precludes TSRA damages would be unconscionable or be contrary to public policy.  For support, FEC cites Florida and West Virginia state cases in which the laws of those states applied.  Florida and West Virginia state law, however, have no application here.[9]  In addition, FEC has not adequately briefed the issue of why the limitation-of-liability provision in the parties' Agreement violates Texas law, or pointed to evidence that would support an affirmative defense on this ground for which it has the summary judgment burden.  *See El Paso Natural Gas Co. v. Minco Oil & Gas Co*., 964 S.W.2d 54, 61-63 (Tex. App.—Amarillo 1997), *rev'd on other grounds*, 8 S.W.3d 309 (Tex. 1999) (discussing at length what is required to establish that a contract is unenforceable as unconscionable or on public policy grounds), *rev'd on*

---

[9] The Agreement states that it and any litigation between the parties involving it "will be governed by and construed in accordance with the laws of the State of Texas."  Pl.'s App. 190.  Moreover, in diversity cases such as this one, a federal court "must apply the substantive law of the forum state," and "state law rules of contractual construction." *Amica Mut. Ins. Co. v. Moak*, 55 F.3d 1093, 1095 (5th Cir. 1995); *Ideal Mut. Ins. Co. v. Last Days Evangelical Ass'n, Inc*., 783 F.2d 1234, 1240 (5th Cir. 1986). Therefore, Texas's rules of contract interpretation control, not the state laws of West Virginia or Florida.

**Memorandum Opinion and Order – Page 18**

*other grounds*, 8 S.W.3d 309 (Tex. 1999) (citation omitted)).  Accordingly, to the extent FEC is relying on unconscionability or public policy affirmative defenses to defeat Heatcraft's summary judgment motion as to FEC's TSRA and corresponding request for treble damages, it has failed to satisfy its burden of demonstrating that no genuine dispute of material fact exists.

Moreover, as previously explained, bargained for limitation-of-liability clauses like section 5.1 are routinely enforced under Texas law.  *Bombardier Aerospace Corp.*, 572 S.W.3d at 231 (citation omitted).  For this reason, the Texas Supreme Court in *Bombardier Aerospace* declined to find the limitation-of-liability clauses in that case unenforceable: "Under our strongly held principles of freedom to contract, we hold that the limitation-of-liability clauses are valid limited warranties that were the basis of the parties' bargain. Although Bombardier's conduct in failing to provide SPEP and PE with the new engines they bargained for was reprehensible, the parties bargained to limit punitive damages, and we must hold them to that bargain."  *Id.* at 233 (citation omitted). The court, therefore, rejects FEC's argument that the limitation-of-liability provision in the Agreement is void as against public policy or unenforceable on unconscionability grounds, as it does not comport with Texas law or Texas's "strongly held principles of freedom to contract," and there is no indication from the parties' Agreement that they agreed otherwise. *See id.*

Further, because statutory damages in the form of treble damages unrelated to actual loss have been held by the Texas Supreme Court to be punitive, the court concludes that the treble damages sought by FEC under the TSRA are barred by section 5.1 of the Agreement, which precludes recovery of punitive damages.  *See In re Xerox Corp.*, 555 S.W.3d 518, 532 & n.81 (Tex. 2018) (citing cases and concluding that treble statutory damages are "essentially punitive" in nature "even if they have 'compensatory traits.'") (citations omitted).

Next, FEC contends that other states have sales representative statutes like the TSRA that allow recovery of treble damages, and it has a pending motion for leave to amend its pleadings to assert claims under other state's sales representative statutes.  The court previously denied FEC's motion for leave (Doc. 93), but any such claims for treble damages would be precluded for the reasons already explained.

Accordingly, for all of these reasons, the court determines that no genuine dispute of material facts exists as to FEC's TSRA claim, and Heatcraft is entitled to judgment as a matter of law on  this claim.  Plaintiff's Motion as to FEC's TSRA claim is, therefore, **granted**, and this claim is **dismissed with prejudice**.

### B.      Defendant's Motion for Partial Summary Judgment

For the reasons that follow, the court determines that: (1) genuine disputes of material fact preclude summary judgment on Defendant's first, second, and third grounds, which appear to pertain to FEC's breach of contract claim and affirmative defenses based on underpayment of commissions in April and May 2020 after Heatcraft changed the commissions schedule; (2) Defendant's fourth, fifth, sixth, seventh, eighth, and eleventh grounds for summary judgment based on its new "locked out" theory fail for the reasons already explain; and (3) genuine disputes of material fact preclude summary judgment on Defendant's ninth and tenth summary judgment grounds.  Accordingly, Defendant's Motion is **denied** for the reasons herein explained, even though the court agrees with FEC's argument that the Agreement does not allow retroactive application of changes to commission schedules until after written notice of such changes are provided by Heatcraft to FEC.[10]

### 1.      First, Second, and Third Grounds (Contract Interpretation)

---

[10] The court need not specifically address Heatcraft's objections to FEC's evidence, including the declaration of Shane Cleveland, as it determines that Defendant's Motion should be denied for other reasons.

### a.      The Parties' Contentions

Regarding the first, second, and third grounds in Defendant's Motion, FEC contends that: (1) the Agreement does not allow Heatcraft to retroactively change the commission schedule for commissions already earned by FEC, and that "no fact issue exists" in this regard; (2) the Agreement clearly distinguishes between "time of sale" and "shipped," and the Agreement's reference to "time of sale" indisputable refers to when a purchase or confirmation order for a product is accepted by Heatcraft; and (3) Heatcraft's construction of "time of sale" as the date product is shipped or invoiced is not supported by the Agreement.

Heatcraft responds that FEC has not met its summary judgment burden as to these issues because it:

> provides no explanation as to what FEC means by "retroactively" changing the Agreement's commission schedule, nor how this assertion relates to—much less entitles FEC to summary judgment in its favor on—its pled claims and defenses. Furthermore, though FEC cites generally to the language of the Agreement, FEC has not identified portions of the record identifying the absence of a genuine issue of material fact on this point.

Pl.'s Summ. J. Resp. 8.  Heatcraft further asserts that the Agreement does not define "time of sale" or support FEC's interpretation of that term, which is "hotly contested," and, in any event, the parties' disagreement regarding the meaning of "time of sale" is one of the key disputes in this case such that summary judgment on these grounds would be improper.

These issues appear to relate to FEC's breach of contract claim or affirmative defense(s) that Heatcraft's retroactive application of the new commission schedule and resulting underpayment of commissions in April and May 2020 was a material breach of the Agreement that excused FEC from further performing under the Agreement.  As such, FEC has the summary judgment burden of establishing all of the elements of this contract claim and defense. *Fontenot*, 780 F.2d at 1194.  FEC, however, has not met this burden because it does not address all of the

elements of its contract claim and defense of excuse; nor does it point to evidence that establishes "beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in [its] favor." *Id.* (emphasis in original).

### b.    Texas Law Applicable to Breach of Contract Claims

In Texas, the elements of a breach of contract claim are: (1) the existence of a valid contract; (2) performance or tendered performance by one party; (3) nonperformance of the contract by the other party; and (4) damages caused by the breach. *USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 501 n.21 (Tex. 2018). Under Texas law, "when one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance." *Mustang Pipeline Co. v. Driver Pipeline Co*., 134 S.W.3d 195, 196 (Tex. 2004) (per curiam); *Lennar Corp. v. Markel Am. Ins. Co*., 413 S.W.3d 750, 753-55 (Tex. 2013) (concluding that one party's breach does not generally excuse the other's performance unless the breach is material). "In determining the materiality of a breach, courts will consider, among other things, the extent to which the nonbreaching party will be deprived of the benefit that it could have reasonably anticipated from full performance." *Hernandez v. Gulf Group Lloyds*, 875 S.W.2d 691, 693 (Tex. 1994). Whether a breach is material is a generally a question of fact for a jury to decide. *Hudson v. Wakefield*, 645 S.W.2d 427, 430 (Tex.1983); *Triton 88, L.P. v. Star Electricity, L.L.C*., 411 S.W.3d 42, 58 (Tex. App.—Houston [1st Dist.] 2013) ("The materiality of a breach—the question of whether a party's breach of a contract will render the contract unenforceable—generally presents a dispute for resolution by the trier of fact.").

### c.    Texas Rules for Contract Interpretation

"The interpretation of an unambiguous contract is a matter of law; the interpretation of an ambiguous contract through extrinsic evidence of the parties' intent is a matter of fact." *Southern*

*Nat'l Gas Co. v. Pursue Energy*, 781 F.2d 1079, 1081 (5th Cir. 1986).  A district court "may properly grant summary judgment when a contract is unambiguous, but may not grant summary judgment when a contract is ambiguous and the parties' intent presents a genuine issue of material fact." *Id.*

When construing a written contract under Texas law, the court's "primary objective is to ascertain the parties' true intentions as expressed in the language they chose." *Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc.*, 473 S.W.3d 296, 305 (Tex. 2015).  The primary concern in construing a written contract is to "effectuate the parties' intent as expressed by the words chosen to memorialize their agreement." *Exxon Mobil Corp. v. Ins. Co. of State*, 568 S.W.3d 650, 657 (Tex. 2019) (footnote and citation omitted).  Contractual language is given its "plain, ordinary meaning" unless the contract itself indicates that the parties intended the terms to have a "technical or specialized" meaning.  *Id.*  Context is important, so courts "must examine the entire writing and endeavor to harmonize and give effect to all the provisions so that none are rendered meaningless." *Id.*

Contracts must also be read "from a utilitarian standpoint bearing in mind the particular business activity sought to be served, and avoiding unreasonable constructions when possible and proper." *Endeavor Energy Res., L.P. v. Energen Res. Corp.*, 615 S.W.3d 144, 148 (Tex. 2020) (citation and internal quotation marks omitted). "[W]hen contractual text alone is inconclusive, courts may consider the facts and circumstances surrounding [the] contract, including the commercial or other setting in which the contract was negotiated and other objectively determinable factors that give context to the parties' transaction." *Id.* (citation omitted). Consideration of surrounding circumstances can sometimes be helpful to understand the words chosen by the parties, but extrinsic evidence such as this cannot be used to create an ambiguity or

justify interpreting contractual "language [to] say what it unambiguously does not say.'" *Id.* (quoting *First Bank v. Brumitt*, 519 S.W.3d 95, 110 (Tex. 2017)); *Plains Expl. & Prod. Co.*, 473 S.W.3d at 305 (quoting *Sun Oil Co. v. Madeley*, 626 S.W.2d 726, 732 (Tex. 1981)).

"Mere disagreement over the interpretation of an agreement does not necessarily render the contract ambiguous." *Plains Expl. & Prod. Co.*, 473 S.W.3d at 305. On the other hand, if a contract's language remains susceptible "to two or more reasonable interpretations" after applying all pertinent rules of contract construction, the agreement is ambiguous as a matter of law. *Id.*

"Industry custom and usage may inform the meaning of words that may carry their plain meaning in some contexts, but may also carry a special meaning in the context of a particular industry." *Barrow-Shaver Res. Co. v. Carrizo Oil &* Gas, Inc., 590 S.W.3d 471, 485 (Tex. 2019) (citations omitted). The reason for this is that parties are generally "presumed to contract in reference to the usage or custom prevailing in the particular trade or business to which the contract relates, and evidence of custom or usage . . . is generally admissible to assist the factfinder in ascertaining the parties' true intent." *Id.* (quoting *Hellenic Inv., Inc. v. Kroger Co*., 766 S.W.2d 861, 866 (Tex. App.—Houston [1st Dist.] 1989, no writ)). Evidence of the parties' subjective intent and conduct, and surrounding facts and circumstances, including evidence of the parties' course of performance in performing the contract and industry custom and usage, however, is "only relevant after the court has determined that the contract is ambiguous." *Endeavor Energy Res., L.P.*, 615 S.W.3d at 148 n.5 (explaining that, absent ambiguity, "the parol evidence rule prohibits extrinsic evidence of subjective intent," including "a party's 'acquiescence' to another party's actions" and "other course-of-performance" evidence) (citations omitted); *Barrow-Shaver Res. Co.*, 590 S.W.3d 471 at 485 n.5 (explaining that the same rule applies to consideration of extrinsic evidence of industry custom and usage) (citations omitted).

In most situations, an ambiguous contract's meaning must be left to the finder of fact, "who may consider evidence of the parties' subjective intent" and "course-of-performance." *Endeavor Energy Res., L.P.*, 615 S.W.3d at 148 & n.5 (citing *Lenape Res. Corp. v. Tenn. Gas Pipeline Co.*, 925 S.W.2d 565, 574 (Tex. 1996)). When consideration of evidence regarding industry custom and usage is appropriate, it is also a question of fact for the jury because witness credibility is for the jury to weigh and assess. *Barrow-Shaver Res. Co.*, 590 S.W.3d at 485 (citations omitted). *Id.*

### d.    Retroactive Application of New Reduced Commission Schedule

Section 3.1 of the Agreement unambiguously allows Heatcraft to change the commission schedule, but it does not expressly state that Heatcraft can retroactively apply the new commission schedule in paying commissions for orders submitted before the new schedule went into effect. Instead, section 3.1 requires Heatcraft to pay commissions according to the "commission schedule in effect at the time of the sale."  Def.'s App. 7.  Specifically, section 3.1 of the Agreement provides:

> When Products have been shipped, the Company shall pay to the Sales Representative a commission on sales of the Products according to the Company's commission schedule in effect at the time of sale (the "Commission(s)"). The Company reserves the right to change the commission schedule at its discretion upon written notification to the Sales Representative. A preliminary commission schedule is set forth in Exhibit B, but may be changed by the Company at its discretion pursuant to this provision without the need to amend this Agreement.

*Id.*  The requirement in this section that Heatcraft can only change the commission schedule "*upon written notification* to the Sales Representative" is clear, not susceptible to more than one meaning, and not industry or vocation specific. *See Nat'l Union Fire Ins.*, 907 S.W.2d at 521 n.6.  Instead, it unambiguously indicates the parties' intention and agreement that any changes to the commission schedule by Heatcraft would not be effective until *after* Heatcraft provided written notice to FEC of such changes. The court's conclusion in this regard is based on the plain meaning

of the word "upon" as used in this sentence, which means "thereafter." Merriam-Webster's Collegiate Dictionary 1375 (11th ed. 2004). Given the absence of any language in the Agreement allowing retroactive application of a new commission schedule, the court further concludes that any changes by Heatcraft to the commission schedule did not apply until *after* it provided FEC with notice in writing of such changes.

Resolution of this discreet issue, however, does not enable the court to grant summary judgment in favor of FEC on its breach of contract claim or affirmative defenses that its performance was excused based on underpayment of commissions because genuine disputes of material fact remain regarding other issues that go to whether FEC or Heatcraft materially breached the Agreement and, if so, which party materially breached first. Specially, genuine issues of material fact exist as to when Heatcraft notified FEC in accordance with the Agreement of its decision to change the commission schedule. The parties' respective pleadings and Heatcraft's evidence refer loosely to dates when Heatcraft announced the change at a meeting and when FEC and other sales representative were on notice, were notified, acknowledged, or became aware of Heatcraft's decision to change the commission schedule, but neither party has pointed to evidence establishing when Heatcraft provided FEC with written notice of such decision as required by section 3.1. Resolution of this issue is necessary to determine whether, as FEC alleges, Heatcraft breached the Agreement by underpaying commissions owed as a result of its retroactive application of the new commission schedule in violation of the Agreement.

### e.     "Time of Sale"

Resolution of the issue of whether Heatcraft breached the Agreement by retroactively applying the newly reduced commission schedule and underpaying FEC's commissions also turns on the meaning of "time of sale" because section 3.1 the Agreement expressly states that

commissions are to be paid by Heatcraft in accordance with the commission schedule in effect at the "time of sale." Def.'s App. 7. As noted, FEC contends that "time of sale" refers to when there is a purchase or confirmation order for a customer to buy a product, which occurs before the shipment date. Heatcraft, on the other hand, contends that "time of sale" refers to when "a physical product is shipped and title is transferred to the customer" because it follows the accrual method of accounting, that is, generally accepted accounting principles ("GAAP") in recognizing receivables or sales of products on its books at the time of shipment when its system considers a sale to be final, not the date the order is placed. Pl.'s Summ. J. Resp. Br. 11; Pl.'s Summ. J. Resp. App. 140-41, 144-45, 149-51, 260-61.

The parties' evidence in this regard is not particularly helpful. FEC submitted the declaration of Shane Cleveland, FEC's vice president, to support its interpretation of "time of sale." The basis for Mr. Cleveland's interpretation, however, is not clear. Heatcraft relies on the deposition testimony of Jeff Pecoroni, Heatcraft's former vice president of sales, and Joe Jernigan, Heatcraft's director of finance and controller. Mr. Pecoroni and Mr. Jernigan both confirmed that, for accounting reasons, Heatcraft does not recognize revenue for sales of product until it is shipped. Mr. Pecoroni also testified that Heatcraft did not pay sales representatives until its products shipped, and that this is how Heatcraft has always done business.

The parties' intent, however, is governed by what they said in the contract, not by what one side or the other alleges they intended to say but did not, and nothing in section 3.1 or the Agreement indicates that the parties' drafted the Agreement with GAAP accounting or tax principles in mind. Additionally, section 3.1 provides that Heatcraft shall pay commissions when products ship, but it does not expressly state that the amount of commissions due and payable at the time of shipment will be determined based on the commission schedule in effect at the time of

shipment. *See Fortis Benefits v. Cantu*, 234 S.W.3d 642, 647, 649 (Tex. 2007) (noting that contract rights arise from the parties' agreement and declining to "judicially rewrite the parties' contract by engrafting extra-contractual standards."). In any event, consideration of the extrinsic evidence presented by the parties is only permissible if the court determines that the term "time of sale" as used in section 3.1 is ambiguous, and, if ambiguous, the meaning of that term would need to be left to the fact finder. The court, therefore, addresses whether the term "time of sale" is ambiguous.

As FEC correctly notes, section 3.1's distinguishes between the time when commissions are payable (when shipped) and how commissions are determined (based on the schedule in effect at the "time of sale"). The parties could have expressly stated that commissions are determined based on the schedule in effect at the time products are shipped, but they instead chose the term "time of sale," which indicates that the parties intended "time of sale" to mean something other than "time of shipment." In layman terms, "time of sale" appears to mean what it says—at the time something was sold. The parties, however, are not laypersons. They are both professionals with vast experience in the commercial refrigeration industry and, thus, are presumed to have contracted in reference to the usage or custom prevailing in that industry as it pertains to the payment of commissions. *See Barrow-Shaver Res. Co.*, 590 S.W.3d at 485. Moreover, the word "sale" can have different meanings in different contexts. For example, Merriam-Webster's Collegiate Dictionary includes a number of definitions for "sale" depending on the type of sale that appear to support both parties' proffered meanings for "time of sale." *See* Merriam-Webster's Collegiate Dictionary 1537-38 (11th ed. 2004). Unlike Texas, some states have statutes that define "time of sale" or when commissions are considered earned. Absent statutory authority, the meaning of "time of sale" turns on ordinary rules of contract interpretation. As noted, however, the Agreement does not define "time of sale," it is silent as to the intended meaning of "time of

sale," and both of the meanings advocated are arguably reasonable, even though the court agrees with FEC that the parties could have easily stated that commissions would be calculated based on the schedule in effect when products are shipped or invoiced by Heatcraft.

For all of these reasons, the existence of genuine disputes of material fact preclude summary judgment on FEC's contract claim and defense of excuse based on underpayment of commissions in April and May 2020, including disputes regarding: the meaning of "time of sale"; the date Heatcraft provided notice in accordance with section 3.1 that it was changing the commission schedule; and, consequently, whether Heatcraft breached the Agreement by paying FEC's commissions for April and May 2020 under the new reduced commission schedule. Whether any such breach was material is also disputed.

### 2. Fifth, Sixth, Seventh, Eighth, and Eleventh Grounds ("Locked Out" Theory)

Defendant's fifth ground pertains to an affirmative defense of estoppel. Defendant's sixth, seventh, and eighth summary judgment grounds appear to pertain to FEC's defense that it did not breach the Agreement because its performance was excused. FEC has pleaded defenses based on estoppel and excuse, but its pleaded defenses to not rely on a "locked out" fact pattern, whereas its fifth, sixth, seventh, and eighth summary judgment grounds are all based on its new theory that it was "locked out" of FEC's proprietary software system in early June 2020. Defendant's eleventh ground for summary judgment also appears to be based on this theory and a defense that its performance was excused, even though it does not expressly state with respect to this ground that it was "locked out" of Heatcraft's system. Defendant's Motion as to these grounds is **denied** for the reasons previously explained by the court because Defendant's "locked out" theory is outside the pleadings and factually inconsistent with the factual bases for the claims and defenses alleged in its amended pleadings. Further, any claims, defenses, or lost profit damages sought by

Defendant for the period between June 2020 and December 2020 based on its "locked out" theory are **stricken**.

### 3.    Ninth and Tenth Grounds (Elements of Contract Claims)

In its ninth ground, Defendant contents that "no fact issue exists that Heatcraft failed to pay FEC $158,891.28 in commissions." Def.'s Mot. 4. Defendant's ninth ground pertains to its breach of contract claim that is based on Heatcraft's underpayment or nonpayment of certain commissions. As previously explained, FEC has the summary judgment burden on this claim, and genuine disputes of material fact exist regarding this claim, including whether Heatcraft's underpayment or nonpayment of certain commissions constitutes a material breach of the Agreement.

Regarding its tenth ground, FEC contends that it did not disclose any of Heatcraft's confidential information in violation of the Agreement. This issue relates to Heatcraft's claim for breach of contract. Genuine disputes of material fact also exist regarding this claim, as both summary judgment claims and FEC's defense that its performance was excused will ultimately turn on whether either party's conduct amounted to a material breach of the Agreement, and, if so, which party materially breached the Agreement first.

The court, therefore, **denies** Defendant's Motion as to both of these grounds.

## IV.    Conclusion

For the reasons explained, the court **denies** Defendant's Motion (Doc. 62); and **grants** Plaintiff's Motion (Doc. 64). Accordingly, any claims, defenses, or lost profit damages sought by Defendant for the period between June 2020 and December 2020 based on its "locked out" theory are **stricken**; and Defendant's TSRA claim and request for treble damages is **dismissed with prejudice**. Further, in light of the court's rulings on the parties' motions and its careful review

and consideration of their respective arguments and evidence, the parties should seriously

considering settling this action, and neither party is "out of the woods" at this juncture.

**It is so ordered** this 31st day of March, 2022.

Sam A. Lindsay
United States District Judge